IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| ANTHEL LAVAN BROWN, | CV 18-00093-H-DLC-JTJ |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| PAUL REES, M.D., | |
| Defendant. | |

Pending is Defendant's Motion for Summary Judgment (Doc. 40).  The

motion should be granted and this matter should be dismissed.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed.R.Civ.P. 56(a).  Under summary judgment practice, "[t]he

moving party initially bears the burden of proving the absence of a genuine issue

of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)

(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may

accomplish this by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials" or by showing that such

1

materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B). Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To establish the existence of this factual dispute, the opposing party may not rely upon the

allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  *See* Fed.R.Civ.P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11.  "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence."  *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party."  *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586 (citations omitted).

Defendant advised Mr. Brown of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure in the November 13, 2019 "Notice and Warning to Plaintiff" (Doc. 43). *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II. FACTS[1]

Mr. Brown has been incarcerated at Montana State Prison (MSP) from at least 2016 to present. (Defendant's Statement of Undisputed Facts, Doc. 41 (hereinafter SUF) at ¶ 1.) Defendant Dr. Paul Rees has been employed with the Montana Department of Corrections as a physician at MSP since December 1, 2016. (SUF at ¶ 2.) He has more than 25 years experience as a physician and throughout his practice, he has managed many patients' chronic pain including chronic non-malignant pain due to musculoskeletal conditions, malignant cancer pain, as well as various neuropathic disease entities. (SUF at ¶ 3.) Dr. Rees' work at MSP is by and large general patient care which requires treatment of patients over time to manage chronic disease or illness. Knowing how long an inmate will be at MSP informs a multitude of treatment decisions. (SUF at ¶ 4.)

---

[1]Mr. Brown did not file a Statement of Disputed Facts as required by Local Rule 56.1(b). Therefore, the facts set forth in Defendant's Statement of Undisputed Facts (Doc. 41) are deemed admitted unless otherwise contradicted by the record. L.R. 56.1(d).

Dr. Rees has been one of Mr. Brown's health care providers since early 2017 and has treated him or followed his care with respect to his health care problems, including diabetes, thyroid issues, chronic non-malignant musculoskeletal pain, hypertension, hyperlipidemia, and pulmonary issues including asthma.  (SUF at ¶ 5.)  Mr. Brown has complained of pain from his back, general arthritis DJD, and diabetic neuropathy.  (SUF at ¶ 8.)

When Dr. Rees started at MSP in December 2016, Dr. Tristan Kohut was monitoring Mr. Brown following a total knee arthroplasty performed earlier in 2016 which may have led to other problems in his low back due to the change in how his body moved after having his knees replaced.  (SUF at ¶ 18.)  Throughout 2016, Mr. Brown was prescribed tramadol by Dr. Scott Piranian and Dr. Kohut. (SUF at ¶ 17.)

Dr. Rees first treated Mr. Brown on or about January 3, 2017 when, at the request of Dr. Kohut, he provided a steroid injection to Mr. Brown for his complaints of low back pain.  (SUF at ¶ 19.)  Based on Dr. Rees's examination, he referred Mr. Brown for an MRI of Mr. Brown's lumbar spine.  After the MRI was performed on January 13, 2017, Dr. Rees reviewed the report and had a visit with Mr. Brown on January 27, 2017.  Mr. Brown reported that the January 3, 2017 lumbar epidural injection had helped improve his pain by 50%.  (SUF at ¶¶ 20-21.) Dr. Rees instructed the nursing staff to start the referral process for Dr. Steve

Martini to perform a neurosurgical evaluation of Mr. Brown.  (SUF at ¶ 22.)

In March 2017, Dr. Kohut had prescribed Mr. Brown Celecoxib, aspirin, gabapentin (Neurontin), methocarbamol (Robaxin), and tramadol (Ultram) to treat pain complaints.  (SUF at ¶ 28.)  Celecoxib is meant to address inflammation causing musculoskeletal pain.  (SUF at ¶ 28.)  Gabapentin is a neuromodulator prescribed to treat nerve discomfort.  (SUF at ¶ 28.)  Tramadol is an opioid receptor agonist and is an opioid, though not an opiate (which is a drug derived from an opium poppy).  (SUF at ¶ 28.)

Mr. Brown next saw Dr. Rees for a health care visit on March 20, 2017.  At that visit, the nurse noted that Mr. Brown wanted to discuss his chronic pain medications and had already spoken with Dr. Kohut about them.  Mr. Brown and Dr. Rees had a general discussion about Mr. Brown's chronic pain issues.  Mr. Brown reported that the last injection had helped him and that he was able to work and was pleased with the current level of pain control.  (SUF at ¶ 23.)  Dr. Rees wrote in his March 20, 2017 medical notes that Mr. Brown reported a history of heroin which amplified Dr. Rees's concerns regarding the long-term continuation of Mr. Brown's then-current medication regimen.  (SUF at ¶ 24.)  Mr. Brown contends Dr. Rees's suggestion of self-reported drug use is not supported by any record and he had only admitted a marginal use of THC when he was unable to get pain relief for his numerous injuries.  (MSJ Response, Doc. 44 at 1.)  Mr. Brown

represents that none of his UA's will confirm the use of class one drugs that Dr. Rees claims to base his decisions on.  (MSP Response, Doc. 44 at 5.)

In Dr. Rees' medical opinion, the consistent use of certain pain medications (like some of those Mr. Brown was taking in March 2017) to treat non-malignant chronic pain (chronic being defined as greater than three weeks) is harmful to patients and ineffective as a result of tolerance and resultant amplification of the pain.  (SUF at ¶ 32.)  Non-narcotic and non-opioid methods are particularly preferred to narcotic, opioid medications in treating patients with chronic non-malignant pain conditions.  (SUF at ¶ 33.)  Despite the discussion of pain issues with Dr. Rees at the March 20, 2017 visit, Mr. Brown was unwilling to consider any type of cessation of medication therapy.  (SUF at ¶ 35.)

At a Chronic Care appointment on May 10, 2017, Mr. Brown again told Dr. Kohut that he was having low back pain.  Dr. Kohut referred Mr. Brown to the Pain Management Committee and Mr. Brown was sent a Pain Management Information Sheet on which to describe his pain complaints.  (SUF at ¶ 36.)

On or around May 16, 2017, Mr. Brown had an appointment with Dr. Rees regarding pain complaints.  Mr. Brown reported fair control of his pain, with a pain level of 4.5 on a 10-point scale, where 10 is the worst, and again stated the epidural injection had been helpful in treating his pain for about three months.  Dr. Rees instructed him about a daily home exercise program and stretching to help treat his

pain.  (SUF at ¶ 37.)

At this visit, Dr. Rees realized his January 27, 2017 order for a referral to Dr. Martini had not been completed and so he restarted the process with a new order. Dr. Rees completed and submitted a preauthorization request seeking a neurosurgical consultation based on Mr. Brown's low back pain with radiculopathy.  Dr. Rees was inclined to take a conservative treatment approach because of concerns regarding hyperalgesia but wanted the opinion of a surgeon. The request was approved on May 30, 2017.  (SUF at ¶ 38.)

Meanwhile, Mr. Brown's Pain Management Information Sheet had been sent to the Pain Management Committee for review and consideration.  (SUF at ¶ 39.)  The Pain Management Committee is a multi-disciplinary team from multiple departments within the prison whose members discuss a global, multi-modal approach to managing patients' chronic pain.  (SUF at ¶ 40.)  Members of the Committee rotate, and consist of medical providers, nursing staff and administrators, occasionally mental health providers, and corrections officers if needed to provide objective passive observations of the inmates being discussed for signs of pain in their daily lives.  As a medical provider, Dr. Rees is sometimes a Committee member.  (SUF at ¶ 41.)  The Committee does not defer to Dr. Rees. It functions as a team and its purpose is to collectively assess patients' medical needs.   (SUF at ¶ 42.)

Dr. Rees participated in the Pain Management Committee's meeting on May 25, 2019, along with three other medical providers, five members of the nursing staff including the director and assistant director of nursing, and a mental health therapist.  (SUF at ¶ 43.)  Dr. Kohut presented Mr. Brown's case and the Committee members discussed it collectively.  With regard to pain medications, the Committee unanimously decided to taper Mr. Brown's tramadol and Robaxin prescriptions one at a time, and reduce his gabapentin to 800 mg/twice a day, and encourage exercise and stretching.  Dr. Kohut would handle a separate, but related matter, regarding shoes and splints.  (SUF at ¶ 44.)  The Plan also included a referral for physical therapy and cognitive behavioral therapy.  Mr. Brown had already been referred for, and was receiving, physical therapy for his total knee arthroplasty.  Dr. Kohut ordered the cognitive behavioral therapy; however, there is no record that Mr. Brown ever attended such therapy.  (SUF at ¶ 45.)  These decisions were formalized with a Pain Committee Treatment Plan to be shared with Mr. Brown at a follow-up visit with Dr. Kohut.  (SUF at ¶ 46.)

Mr. Brown had a visit with Dr. Kohut on July 10, 2017 to discuss the Pain Management Committee's May 2017 treatment plan.  (SUF at ¶ 47.)  At the time of that visit, Mr. Brown had missed the prior six days of his tramadol prescription and all but one of his gabapentin doses.  (SUF at ¶ 48.)  Dr. Kohut attempted to explain the rationale of the prescription changes and treatment

options, but Mr. Brown refused to listen or engage in discussions and left prior to the scheduled end of the visit.  (SUF at ¶ 49.)  Dr. Kohut's description of Mr. Brown's reaction, on July 10, 2017, to the information that his pain medications would be tapered off and changed was consistent with Dr. Rees' interaction with Mr. Brown in March 2017 when Mr. Brown also refused to discuss the matter. (SUF at ¶ 50.)

Consistent with the May 2017 Pain Management Plan, Dr. Kohut continued the Robaxin prescription, lowered the gabapentin dosage, and issued a new, tapering prescription of tramadol which would conclude with Mr. Brown being off tramadol by the end of the month.  (SUF at ¶ 51.)

Mr. Brown submitted a grievance dated August 3, 2017 regarding Dr. Kohut.  Shannon Maes responded to this grievance.  Dr. Rees was not involved in addressing the grievance and did not learn about it until after the filing of this lawsuit.  (SUF at ¶ 52.)

Mr. Brown saw Dr. Martini on August 2, 2017 for a neurosurgical consultation.  Dr. Martini also administered a lumbar epidural injection.  (SUF at ¶ 53.)  Dr. Martini made three recommendations:  (1) that Mr. Brown be returned to tramadol and the Neurontin be increased again (Dr. Martini sent Mr. Brown back to MSP with prescriptions these medications) (SUF at ¶ 54.); (2) for possible electrodiagnostic testing (SUF at ¶ 59); and (3) possibly repeating the MRI of Mr.

Brown's lumbar spine to see if the disc herniation had resolved and to see if there had been progression of his stenosis (SUF at ¶ 61).

Dr. Martini's recommendation regarding medications for Mr. Brown was contrary to the May 2017 Pain Management Plan which had just been implemented with Mr. Brown being successfully tapered off tramadol at the end of July 2017 and his gabapentin dosage lowered.   (SUF at ¶ 55.)  Because of this contrary recommendation, Dr. Rees contacted Dr. Martini to discuss the prescriptions. From that phone conversation Dr. Rees learned that Mr. Brown asked Dr. Martini to recommend increasing Mr. Brown's pain medication and Dr. Martini complied with Mr. Brown's wishes.  (SUF at ¶ 56.)  Dr. Rees acknowledged Dr. Martini's recommendations but explained that given Mr. Brown's long-term consistent use of opioids he did not agree with increasing Mr. Brown's medication.  He cited to the likelihood of decreased effectiveness because of tolerance and resultant amplification of the pain in support of his position.   (SUF at ¶ 57.)  Dr. Rees explained to Dr. Martini that MSP was using regular drug holidays to attempt minimize tolerance and opioid receptor down regulation with the hopes of achieving satisfactory pain management with multimodal non-narcotic therapy in accordance with 2016 CDC recommendations, then newly released.  Dr. Martini agreed this would be a reasonable approach and he would stick to provision of specialized injections, while pain medication management would remain with MSP

clinical services providers.   (SUF at ¶ 58.)

Dr. Martini's second recommendation was for possible electrodiagnostic testing.  (SUF at ¶ 59.)  In Dr. Rees' experience the results of electrodiagnostic testing are variable and not corroborated by physical findings so he leaves the question of whether to order those tests up to the evaluating neurosurgeon who, in most cases, does not require the nerve conduction studies to make his determination for or against surgery.  (SUF at ¶ 60.)

Dr. Martini's final recommendation was possibly repeating the MRI of Mr. Brown's lumbar spine to see if the disc herniation had resolved and see if there had been progression of his stenosis.  (SUF at ¶ 61.)  In Dr. Rees's opinion, a repeat MRI has not been indicated for the following reasons:  (1) Mr. Brown had previously reported three months of pain relief with the January 2017 trigger point injection; (2) at his mid-May visit with Dr. Rees (prior to seeing Dr. Martini) his exam showed good back mobility, a 4.5/10 average pain rating, and no notation of neurologic deficits; (3) at neither of the next two visits with Dr. Rees was there indication of an objective need to repeat the MRI; and (4) Dr. Rees had regularly observed Mr. Brown in the waiting area of the Infirmary and Mr. Brown's behavior and movements did not demonstrate any external signs of pain nor debility.  (SUF at ¶ 62.)

Mr. Brown next saw Dr. Rees on August 28, 2017 for a chronic care

Appointment.  At this visit Mr. Brown reported he had no relief from the injection

Dr. Martini administered on August 2, 2017.  (SUF at ¶ 63.)  At this point, Dr.

Kohut had informed Mr. Brown of the Pain Management Committee's decision to

start transitioning him to a non-narcotic plan of care and he had tried to persuade

Dr. Martini to re-issue the old prescriptions.  Mr. Brown appeared frustrated and

the visit with Dr. Rees quickly deteriorated into Mr. Brown becoming aggressive.

The visit got off track before Dr. Rees could perform a physical examination.

(SUF at ¶ 64.)  Instead of an exam, Mr. Brown engaged in an extended discourse

about his medical history to Dr. Rees.  He told Dr. Rees that he had a serious

addiction to heroin while in prison, which he funded by smuggling and selling

drugs.[2]  Mr. Brown described having his appendix rupture and then his withdrawal

from heroin.  He also described engaging in heavy weightlifting for several years

and repeatedly mentioned an ongoing lawsuit regarding his pain regimen against

Dr. Scott Piranian, a former physician at MSP.  (SUF at ¶ 65.)  Dr. Rees was not

then, and is not now, aware of what lawsuit Mr. Brown was referring to in August

2017.  (SUF at ¶ 66.)  When Mr. Brown finished his extended discourse, Dr. Rees

explained to Mr. Brown the pain medication he would prescribe, including

Robaxin, gabapentin, and a final 60-day run of tramadol; but Mr. Brown again

---

[2]Mr. Brown contends this alleged self-report of drug use is not supported by
the record.  (MSJ Response, Doc. 44 at 1.)

refused to consider drug holidays as a way to preserve his pain receptors.  (SUF at ¶ 67.)

Consistent with what Dr. Rees told Mr. Brown during the August 28, 2017 visit, Dr. Rees re-instated a prescription for 60 days of tramadol, to be followed by a drug holiday.  (SUF at ¶ 68.)  Although Mr. Brown had not been taking his gabapentin or Robaxin prescriptions for roughly a week before the August 28, 2017 visit, Dr. Rees renewed these prescriptions as well.  (SUF at ¶ 69.)  This was the first time Dr. Rees prescribed pain medications for Mr. Brown.  (SUF at ¶ 70.)

Because the August 28, 2017 visit was hindered by Mr. Brown's constant reference to a lawsuit and aggressive behavior, Dr. Rees wanted to try and explain the treatment plan in writing, rather than in person and so, the next day, he sent Mr. Brown a note explaining his intention and the goals and rationale for changing Mr. Brown's pain medications.  (SUF at ¶ 71.)   Dr. Rees wrote,

> Mr. Brown,
>
> My intention is to provide you with the best pain relief and quality of life while at MSP with the means at my disposal, my best medical judgement and the policies/procedures and goals of safety and security here at MSP.  Our visit yesterday was hindered by your constant reference to your lawsuit.  I have taken Dr. Martini's recommendations into account and I am revising your Pain Plan to include drug holidays to maintain your receptor population as well as cognitive behavioral therapy.  I spoke with Melissa re your shoewear and ~~progr~~ it is moving forward.  I will see you in 4 mos.
>
> Best Regards, Paul Rees MD

14

(SUF at ¶ 72.)

Because Mr. Brown made statements at the August 28, 2017 visit to the effect that he was the biggest narcotics smuggler in the prison to support his $300/day heroin habit, Dr. Rees was concerned about Mr. Brown's continued employment at the Infirmary where his job was to sit with another inmate who was likely receiving narcotics.  In Dr. Rees's opinion, this presented a risk of diversion. (SUF at ¶ 73.)  Dr. Rees contends he has no authority over inmate employment, but he did convey his concerns about the suitability of Mr. Brown's position as a sitter in the infirmary.  (SUF at ¶ 74.)  Mr. Brown presented an August 29, 2017 Work Removal Request signed by Linda Jess as his supervisor asking that Mr. Brown be removed as an infirmary aide for the following reason:  "per Provider inmate is no longer able to be a sitter."  (Doc. 1-6 at 15.)  Mr. Brown was apparently let go from his position, but later reinstated after an investigation.  (SUF at ¶ 74.)

During the August 28, 2017 visit, Mr. Brown also mentioned something about needing shoe inserts or different shoes.  (SUF at ¶ 75.)  Issues regarding shoes are a matter handled by Melissa Scharf, then Director of Nursing, rather than by Dr. Rees.  Nevertheless, after the August 28, 2017 visit, Dr. Rees spoke to Ms. Scharf about Mr. Brown's footwear.  On September 5, 2017, Dr. Rees submitted a Preauthorization Request form, and later in October 2017 he referred Mr. Brown for consultation and fitting of those shoes and inserts.  (SUF at ¶ 77.)  According to

Dr. Rees, Mr. Brown received the orthotic inserts and shoes by November 2, 2017. (SUF at ¶ 78.)  Mr. Brown contends that he has not received replacement prosthetic shoes prescribed for him by three different doctors and a physical therapist.  (MSJ Response, Doc. 44 at 3.)

Dr. Rees next saw Mr. Brown for a visit on October 27, 2017.  (SUF at ¶ 79.)  After Mr. Brown's confrontational and aggressive behavior at the August 28, 2017 visit, Dr. Rees requested that a witness be present for future health care visits with Mr. Brown.  The witness is subject to HIPPA and their name is noted on the Progress Note form in the space provided, "Witness to Appointment: …."  (SUF at ¶ 80.)  At the visit on October 27, 2017, Mr. Brown complained that his back pain was a 10 on a 1-10 scale where 10 is the worst and repeated that the prior epidural steroid injection had not provided any relief.  Dr. Rees' physical examination of Mr. Brown, however, revealed no lower motor neuron deficits, which was consistent with Dr. Rees' passive observations of Mr. Brown when he was in the infirmary daily for insulin injections.  (SUF at ¶ 81.)

The plan of care for managing Mr. Brown's non-malignant chronic pain was unchanged and Dr. Rees set a prescription for tramadol to restart after a two-week drug holiday set to run from October 28 to November 9, 2017.  (SUF at ¶ 82.)  Dr. Rees renewed this prescription on November 10, 2017 to run 60 days through January 8, 2018.  In December 2017, however, Mr. Brown missed 13 doses and

refused 10 more.  In January 2018, Dr. Rees renewed the prescription again after the drug holiday from January 8 to 21, 2018, for 60 more days until March 22, 2018.  This was Dr. Rees' last prescription for tramadol.  Following the end of the next drug holiday, on April 6, 2018, Family Nurse Practitioner (FNP) Amber Edwards began prescribing the medication.   (SUF at ¶ 83.)

Although the Pain Management Committee's Plan was unchanged with regard to narcotics, Dr. Rees did change the medication used to treat Mr. Brown's nerve discomfort to Cymbalta (rather than gabapentin), an alternative neuromodulator approved by the FDA.  (SUF at ¶ 84.)  Dr. Rees prefers Cymbalta to gabapentin because Cymbalta is the superior neuromodulator, based on clinical trials.  Gabapentin was also shown to be prone to abuse by those prescribed the medication who have hoarded, smoked, and otherwise misused the medication for mood altering purposes.  (SUF at ¶ 85.)  Although Dr. Rees was unaware of any medication misuse by Mr. Brown, he had concerns arising from Mr. Brown's self-reported history of drug use, including IV drug use, experimentation with "everything", and especially his reported daily use of heroin, including while at MSP.  (SUF at ¶ 86.)  Mr. Brown would not take the Cymbalta for reasons that he did not state to Dr. Rees.  (SUF at ¶ 87.)  Mr. Brown claims he did try this medication and informed the infirmary of the adverse effects that he suffered with both Cymbalta.  He contends he had "disturbing side effects", informed infirmary

staff that he could not continue to take this medication, and requested to be put back on his prior medications which had worked for him.  (MSJ Response, Doc. 44 at 5.)

Dr. Rees also again instructed Mr. Brown at the October 27, 2017 visit to employ a home exercise program, reduce his weight, and engage in stretching techniques.  Mr. Brown was to be seen again in two months.  (SUF at ¶ 88.)  It was only after Mr. Brown filed this lawsuit that Dr. Rees learned for the first time that Mr. Brown filed a grievance about this October 27, 2017 visit, claiming Dr. Rees was retaliating against him for a legal action Mr. Brown filed against Drs. Rees and Kohut.  Shannon Maes responded to the grievance.  (SUF at ¶ 89.)  In October 2017, the only legal action Dr. Rees was aware of Mr. Brown having filed was the one Mr. Brown repeatedly referenced at the August 28, 2017 visit regarding Dr. Piranian's pain regimen.  Dr. Rees does not recall ever using foul language to Mr. Brown or defaming or threating him.  Dr. Rees does not hate inmates and does not believe all inmates are after is drugs for which to get high on.  (SUF at ¶ 90.)

Dr. Rees next saw Mr. Brown for a follow-up on December 29, 2017.  (SUF at ¶ 91.)  Dr. Rees only performed a limited exam of Mr. Brown at this appointment because, as had become common, Mr. Brown was confrontational and uncooperative, and insistent on discussing his pain complaints.  Using a 10-point scale, Mr. Brown reported his pain with the medications was a 4-5, and without the

medications was an 8-9.  (SUF at ¶ 92.)  Mr. Brown had not been taking the

Cymbalta prescription started in October 2017, so Dr. Rees discontinued it in favor

of oxcarbazepine, a different neuromodulator to address both diabetic neuropathic

and lumbar radiculopathic pain.  Oxcarbazepine is also an antidepressant used for

anxiety disorders and as a neuromodulator in peripheral neuropathy.  (SUF at ¶

93.)  Mr. Brown contends he also had "disturbing side effects" with the

oxcarbazepine, that he informed infirmary staff that he could not continue to take

this medication, and requested to be put back on his prior medications which had

worked for him.  (MSJ Response, Doc. 44 at 5.)  This visit on December 29, 2017,

was the last time Mr. Brown came to a visit with Dr. Rees.  (SUF at ¶ 94.)

    In early December 2017, Mr. Brown also filled out an updated Pain

Management Information Sheet for the Pain Management Committee's review of

his pain plan.  (SUF at ¶ 95.)  Dr. Rees participated in the Pain Management

Committee meeting on February 15, 2018, along with two other medical providers,

the directors of nursing and a member of the nursing staff, a member of the

medical records staff, the discharge planner, and someone from the mental health

department.  (SUF at ¶ 96.)  Mr. Brown's case was presented and relevant portions

of his chart reviewed and then discussed by the Committee members collectively.

The Committee's unanimous decision was to continue the prior plan, including

drug holidays from tramadol.  (SUF at ¶ 97.)  This decision was formalized with a

Pain Committee Treatment Plan signed by FNP Edwards and Dr. Rees on behalf of the Committee.  (SUF at ¶ 98.)

Dr. Rees was not involved in addressing Mr. Brown's grievance dated March 26, 2018 and did not even learn about it until after Mr. Brown filed this lawsuit.  (SUF at ¶ 99.)

FNP Edwards saw Mr. Brown for his next chronic care appointment on April 5, 2018.  Mr. Brown evidently complained of inadequate pain control but had no complaints regarding his chronic medical conditions.  (SUF at ¶ 100.)  FNP Edwards tried to discuss the Pain Management Committee's plan but described Mr. Brown as difficult to redirect and thus she was unable to engage him in a meaningful assessment.  (SUF at ¶ 101.)  FNP Edwards's description of Mr. Brown's behavior at the April 5, 2018 visit and her struggles to redirect Mr. Brown were consistent with Dr. Rees' prior experiences with Mr. Brown where his focus on pain medications and disagreement with the Pain Management Committee's decisions made the visit tense and further assessment difficult.  (SUF at ¶ 102.)

Dr. Rees was next directly involved in Mr. Brown's treatment on May 22, 2018.  Nursing staff assessed Mr. Brown for reported vision changes and then contacted Dr. Rees.  (SUF at ¶ 103.)  In response, Dr. Rees made an immediate referral to Rocky Mountain Eye Center to have Mr. Brown evaluated and he was taken for this consultation shortly thereafter.  Dr. Rees also ordered several lab

tests based on the consultation.  (SUF at ¶ 104.)  Dr. Thomas saw Mr. Brown

follow-up.  (SUF at ¶ 105.)

The Pain Management Committee also discussed Mr. Brown's care at its

June 12, 2018 meeting.  Dr. Rees participated as a committee member, along with

two other medical providers, the director of nursing, and the chronic care nurse.

(SUF at ¶ 106.)  The Committee discussed Mr. Brown's case and decided to renew

the tramadol prescription following the drug holiday then currently in effect, and

then offer nonnarcotic pain medication.  (SUF at ¶ 107.)  The Pain Management

Committee authorized a final 60-day run of Mr. Brown's tramadol prescription

even though Mr. Brown had been regularly refusing his tramadol since April 2018.

(SUF at ¶ 108.)  There was a drug holiday from March 23, 2018 to April 5, 2018.

FNP Edwards renewed the prescription for 60 days, to begin April 6, 2018.  (SUF

at ¶ 109.)  Mr. Brown took the medication for the first two days (April 6 and 7) and

then refused for the next 22 days.  Mr. Brown did take the medication on April 30,

2018 but in May 2018 he refused or missed all but four days of the prescription.

Mr. Brown's refusals continued into June when he refused all four doses prior to

the drug holiday that started June 5, 2018.  (SUF at ¶ 110.)

In other words, from the end of the drug holiday on April 6, 2018, until his

next (and final) drug holiday began 60 days later, Mr. Brown only took his

tramadol seven times.  Although the medical records do not reveal exactly why the

Pain Management Committee's final tramadol renewal was not filled, the records do show that Mr. Brown had already transitioned himself off the medication.  (SUF at ¶ 111.)  Mr. Brown frequently refused or missed doses of the medications prescribed to help manage his pain complaints, including not only tramadol but also methocarbamol (a muscle relaxer), gabapentin (a neuromodulator), and oxcarbazepine (also a neuromodulator), among others.  (SUF at ¶ 118.)

After Mr. Brown filed this lawsuit, Dr. Rees learned for the first time that Mr. Brown submitted a June 19, 2018 grievance regarding the final drug holiday in June 2018.  Mr. Brown stated in his grievance that he intended to file a tort claim against Dr. Rees.  Shannon Maes responded to the grievance and Dr. Rees was not involved in the response.  (SUF at ¶ 112.)  Dr. Rees was not aware that Mr. Brown was taking legal action against him until December 2018.  (SUF at ¶ 113).

Since discontinuation of the prescription of tramadol in summer 2018, and the substitution of Cymbalta and oxcarbazepine for the gabapentin, there have not been any medications classified as opioids prescribed for Mr. Brown.  (SUF at ¶ 114.)

Even though he refused or missed 53 of his available doses of tramadol during the prior period, at a pain clinic appointment on July 12, 2018 to discuss the Pain Management Committee's plan, Mr. Brown told Dr. Thomas that his lower back pain was 8 out of 10.  Dr. Thomas described trying to discuss non-narcotic

options to treat Mr. Brown's pain, but Mr. Brown was either not interested or refused to consider them and only wanted tramadol.  (SUF at ¶ 122.)  Dr. Thomas' description of his struggles to treat Mr. Brown at the visit on July 12, 2018 were consistent with Dr. Rees' prior interactions with Mr. Brown concerning pain management.

Mr. Brown was to have his next chronic care appointment in December 2018, with Dr. Rees but Mr. Brown did not come to the appointment.  (SUF at ¶ 124.)

Dr. Rees contends he considered Mr. Brown's entire pain system in treating his pain.  This included encouraging Mr. Brown to focus on mental health therapy, as non-physical events, including depression and anxiety, often exacerbate pain perception.  As part of his assessment of the degree of pain suffered by Mr. Brown, Dr. Rees attempted to engage in discussions with Mr. Brown on his complaints of pain and discomfort and observed Mr. Brown in both a treatment setting during examinations and outside a treatment setting, such as when Mr. Brown was in the Infirmary for his daily insulin injection.  Dr. Rees noted no objective external signs of debilitating pain limiting Mr. Brown's normal daily activities and no such objective signs were reported to him.  (SUF at ¶ 117.)

Despite being diabetic, Mr. Brown often refused to test his blood sugars and at times was not using his insulin.  (SUF at ¶ 119.)  Between January 2017 and July

2018, Mr. Brown's blood pressure fluctuated from upper normal to mildly high. Mr. Brown's elevated blood pressure readings started well before he was moved to a non-narcotic pain management plan and he has been prescribed medications to manage his blood pressure.  (SUF at ¶ 120.)

Mr. Brown also received testing and evaluation for his health problems.  In addition to multiple physical examinations, he received physical therapy for plantar fasciitis and plantar fascial fibromatosis, bilateral knee replacements, MRI and x-rays of his back, lumbar epidural steroid injections, and other testing and diagnostic procedures to evaluate his health problems; he has also received dental care, and assistance with his orthotic inserts.  (SUF at ¶ 127.)

## III.  ANALYSIS

Mr. Brown filed his complaint on September 24, 2018.  (Doc. 1.)  He alleged that Drs. Kohut and Piranian prescribed him effective pain medication for his chronic, severe pain for years before Dr. Rees assumed control over his medical treatment.  Mr. Brown contends Dr. Rees has a personal bias against the use of any medication that is effective in alleviating severe, chronic pain, and bragged that he was going to completely stop the use of effective pain medications for the entire prison population.  He claims Dr. Rees denied him effective medications for his severe, chronic pain caused by his bad knees which have been replaced through surgery.  He claims Dr. Rees's refusal to provide effective medications causes him

to suffer an inability to exercise and remain active, high blood pressure, stress, and depression.  (Complaint, Doc. 1 at 2-4.)  In his Affidavit in support of his Motion for Temporary Restraining Order, Mr. Brown also claimed that Dr. Rees denied him orthotic inserts and soft soled shoes and removed him from his medication for diabetic nerve pain.  (Affidavit, Doc. 1-5 at 6-7.)

To prove a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, a plaintiff must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Thus, to prevail, Mr. Brown must show both that his medical needs were objectively serious, and that Defendant possessed a sufficiently culpable state of mind.  *Wilson v. Seiter*, 501 U.S. 294, 299 (1991); *McKinney v. Anderson*, 959 F.2d 853, 854 (9th Cir. 1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."  *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Indications that a prisoner has a serious need for medical treatment are the following:  the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence

of chronic and substantial pain. *Wood v. Housewright*, 900 F.2d 1332, 1337–41 (9th Cir. 1990) (citing cases); *Hunt v. Dental Dept.*, 865 F.2d 198, 200–01 (9th Cir. 1989); *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds, WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). The Court will presume for purposes of these Recommendations that Mr. Brown has serious medical care needs.

Once there is a showing of a serious medical need, a plaintiff must show that defendants were deliberately indifferent to that need. In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court established a demanding standard for "deliberate indifference." Negligence is insufficient. *Farmer*, 511 U.S. at 835. Deliberate indifference is established only where the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal citation omitted). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).

A physician need not fail to treat an inmate altogether to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if

26

some treatment is prescribed, may constitute deliberate indifference in a particular

The only claim plead in the Complaint is that Dr. Rees discontinued medications which had previously proven effective for Mr. Brown.  But at most, Mr. Brown has alleged that Dr. Rees has a different opinion on the method of treating Mr. Brown's pain issues than Mr. Brown and other doctors.  Such allegations, however, are is insufficient to establish an Eighth Amendment claim. Differences in judgment as to appropriate medical diagnosis and treatment between an inmate and prison medical providers—or, for that matter, between medical providers—are not enough to establish a deliberate indifference claim.  *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  "A difference of medical opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim."  *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Courts have routinely held that the decision to provide alternative pain medications does not establish deliberate indifference.  *See Fausett v. LeBlanc*, 553 Fed.Appx. 665 (9th Cir. 2014) (affirming summary judgment for defendants where doctors did not provide Valium ordered in hospital-discharge instructions after spinal-fusion surgery and instead provided substitute medicine and other pain medications); *Gauthier v. Stiles*, 402 Fed.Appx. 203 (9th Cir. 2010) (plaintiff's disagreement with the dosage and type of pain medication administered after surgery not deliberate indifference); *Shiira v. Hawaii*, 706 Fed. Appx. 436

(2017)(affirming summary judgment for defendants who deprived plaintiff of methadone and Percodan but offered over-the-counter pain medication and treatment for potential detoxification symptoms; plaintiff's expert did not testify that offering alternative pain medications would be medically inappropriate).

Therefore, the fact that Mr. Brown disagrees with Dr. Rees's decision not to provide him with specific pain medications does not plausibly support an Eighth Amendment claim.

Instead, "to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (*quoting Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).  That is, Mr. Brown must demonstrate that Dr. Rees's decision to provide alternative medications instead of the medications Mr. Brown preferred was medically unacceptable and done in conscious disregard to Mr. Brown's health. Mr. Brown has not presented sufficient evidence to make this showing and overcome Dr. Rees's testimony that consistent use of opioid medication for chronic non-malignant pain is ineffective and harmful to patients.  Mr. Brown failed to present evidence to establish that the non-narcotic pain management program was medically unacceptable or done in deliberate indifference of Mr.

28

Brown's medical needs. The undisputed evidence is that Mr. Brown has also had access to and utilized medications and treatments that are alternatives to opioid medication to treat pain and discomfort. These included ibuprofen, acetaminophen, naproxen and other NSAIDS. (SUF at ¶ 15.)

Dr. Rees has explained his reasoning for changing Mr. Brown's medications and the Pain Management Committee upheld that decision on three occasions. Moreover, Mr. Brown was provided a program which included stretching techniques, muscle strengthening, weight loss, hot and cold therapy, muscle rub, and discussions regarding Cognitive Behavioral Therapy to assist with his pain. (SUF at ¶ 11.) Mr. Brown presented no evidence to demonstrate that the plan to decrease or taper his use of tramadol and to implement drug holidays, ultimately transitioning him to non-narcotic multimodal pain management was medically unacceptable. Although Mr. Brown contends the medications were ineffective, Dr. Rees presented undisputed evidence that Mr. Brown frequently refused and/or missed his doses of medications prescribed to help manage his pain complaints, including not only tramadol but also methocarbamol (a muscle relaxer), gabapentin (a neuromodulator), and oxcarbazepine (also a neuromodulator), among others. (SUF at ¶ 118.)

Mr. Brown complained that Dr. Rees removed his medication for diabetic nerve plan and refused to discuss any replacement plan. (Doc. 1-5 at 6.) Mr.

Brown had intermittently received a medication called gabapentin for nerve discomfort.  For a time in late 2017, however, Dr. Rees prescribed Mr. Brown an alternative neuromodulator approved by the FDA, called Cymbalta, in place of gabapentin.  Dr. Rees indicated that he preferred Cymbalta to gabapentin because Cymbalta was the superior neuromodulator, based on clinical trials.  (SUF at ¶¶ 84, 85.)  In December 2017 after Mr. Brown refused to take the Cymbalta, Dr. Rees prescribed oxcarbazepine, a different neuromodulator to address both diabetic neuropathic and lumbar radiculopathic pain.  (SUF at ¶ 93.)  Mr. Brown stated in his response that he had "disturbing side effects" to these medications which he told infirmary staff (Doc. 44), but he presented no evidence regarding what those specific side effects were or that he ever told Dr. Rees about those side effects.

With regard to Mr. Brown's blood pressure, the undisputed evidence is that between January 2017 and July 2018, Mr. Brown's blood pressure fluctuated from upper normal to mildly high.  Mr. Brown's elevated blood pressure readings, however, started well before he was moved to a non-narcotic pain management plan and he was prescribed medications to manage his blood pressure.  (SUF at ¶ 120.)

It is also undisputed that Mr. Brown received testing and evaluation for his health problems.  In addition to multiple physical examinations, Mr. Brown received physical therapy for plantar fasciitis and plantar fascial fibromatosis,

bilateral knee replacements, MRI and x-rays of his back, lumbar epidural steroid injections, and other testing and diagnostic procedures to evaluate his health problems; he has also received dental care, and assistance with his orthotic inserts. (SUF at ¶ 127.)

Mr. Brown maintains that he has never received orthotic inserts, but the undisputed facts are that issues regarding shoes are a matter handled by Melissa Scharf, then Director of Nursing, rather than by Dr. Rees.  (SUF at ¶ 76.) Nevertheless, Dr. Rees testified that he also spoke to Ms. Scharf regarding the footwear issue, submitted a Preauthorization Request form, and referred Mr. Brown for consultation and fitting of those shoes and inserts.  (SUF at ¶ 77.)

Mr. Brown also claims he lost sight in his left eye due to staff neglect.  He claims Dr. Furlong told him that he could have saved Mr. Brown's eye if he had seen him within 12-24 hours, but he was not transported until three and a half days later.  But the undisputed evidence is that Dr. Rees made an immediate referral to Rocky Mountain Eye Center to have Mr. Brown evaluated after nursing staff contacted him about Mr. Brown's vision changes.  Dr. Rees also ordered several lab tests based on the consultation.  (SUF at ¶ 104.)

## IV.  CONCLUSION

Defendant met his burden of proving "that there is an absence of evidence to support" Mr. Brown's claim of deliberate indifference.  *See Oracle Corp.*, 627

31

F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B).

Mr. Brown, in turn, failed to establish that a genuine issue as to any material fact

exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586-87 (1986). Mr. Brown simply relies upon his own disagreement with Dr.

Rees's treatment. There is a failure of proof concerning several essential elements

of Mr. Brown's claim necessitating entry of summary judgment. *See Celotex*, 477

U.S. at 322. He has not tendered any evidence to establish a genuine issue of

material fact regarding his claims of deliberate indifference to his serious medical

needs. At most, Mr. Brown has established a difference of opinion regarding his

medical treatment which is insufficient to maintain an Eighth Amendment claim of

deliberate indifference to a serious medical need.

Mr. Brown provided no evidence to demonstrate that a reasonable jury

could return a verdict in his favor. See *Anderson*, 477 U.S. at 248. Dr. Rees is

entitled to summary judgment.

Based upon the foregoing, the Court issues the following:

## RECOMMENDATIONS

1. Defendant's Motion for Summary Judgment (Doc. 40) should be

GRANTED.

2. The Clerk should be directed to enter judgment and close this matter.

3. The Clerk of Court should also be directed to have the docket reflect that

the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate

Procedure that any appeal of this decision would not be taken in good faith.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations

within fourteen days after service (mailing) hereof.[3]  28 U.S.C. § 636.  Failure to

timely file written objections may bar a de novo determination by the district judge

and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of

Appeals.  Any notice of appeal pursuant to Fed.R.App.P.  4(a), should not be filed

until entry of the District Court's final judgment.

DATED this 23rd day of April, 2020.


 */s/ John Johnston*
John Johnston
United States Magistrate Judge

---

[3]Mr. Brown is entitled to an additional three days after the fourteen-day period would otherwise expire to file his objections.